UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NASEAN BONIE,

                              Plaintiff,

        v.

ANTHONY ANNUCCI, *et al.*,

                              Defendants.

No. 20-CV-640 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Nasean Bonie
Auburn, NY
*Pro se Plaintiff*

Amanda Yoon, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants Anthony Annucci, Mark Royce, Ileshema Thomas, David Mazzalla &
Timothy Brogan*

Anthony J. Harwood, Esq.
Harwood Law PLLC
New York, NY
*Counsel for Defendant Adana Matthews*

Stacey Ann Van Malden, Esq.
Bronx, NY
*Counsel for Defendant Adana Matthews*

KENNETH M. KARAS, District Judge:

        Plaintiff Nasean Bonie ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. §

1983, against Commissioner Anthony Annucci ("Annucci"), Superintendent Mark Royce

("Royce"), Correctional Officer Ileshema Thomas ("Thomas"), Sergeant Latasha Cobb

("Cobb"), Correctional Officer Joshua Ruiz ("Ruiz"), Sergeant David Mazzalla ("Mazzalla"),

Correctional Officer Timothy Brogan ("Brogan"), and Correctional Officer Adana Matthews ("Matthews"; collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims.  (*See* Am. Compl. ¶¶ 1, 18 (Dkt. No. 19).)[1] Before the Court are three separate Motions to Dismiss: one filed by Annucci, Royce and Thomas (collectively, "First Defendants"), (*see* Notice of First Defs.' Mot. to Dismiss ("First Mot.") (Dkt. No. 147)), the other filed by Cobb, Mazzalla, Brogan and Ruiz, (collectively, "Second Defendants"), (*see* Notice of Second Defs.' Mot. to Dismiss ("Not. of Second Mot.") (Dkt. No. 161)), and the third filed by Matthews (*see* Notice of Matthews Mot. to Dismiss ("Not. of Matthews Mot.") (Dkt. No. 267)).  For the following reasons, Defendants' Motions To Dismiss are granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint as well as attached exhibits and are assumed to be true for the purpose of deciding the instant Motions.

At the time Plaintiff commenced this Action, he was incarcerated at Green Haven Correctional Facility ("GHCF" or "Green Haven"), located in Stormville, New York.  (Am. Compl. ¶ 3.)  Plaintiff alleges that Defendants are each employed in different capacities at the

---

[1] Plaintiff's Amended Complaint, as filed, comprises fill-in-the-blank paperwork, a handwritten complaint with numbered paragraphs, and exhibits thereto.  (*See generally* Am. Compl.)  For clarity, when the Court cites the Amended Complaint using paragraph numbers, this is in reference to the numbered paragraphs of the handwritten complaint on ECF-stamped pages 9–20.  When the Court cites other portions of this filing, it uses page numbers outside of this range.

Plaintiff's Amended Complaint also fails to specify the first names of all Defendants and as such, the Court adopts Defendants' first names from court filings.  (*See* Not. of Appearance (Dkt. No. 135); Letter from Defendant to Court (Dec. 1, 2020) (Dkt. No. 158); Letter from Plaintiff to Court (Mar. 9, 2022) (Dkt. No. 247).)

New York Department of Corrections and Community Supervision ("DOCCS").  (*See id.* ¶¶ 4–11.)  Annucci is the Acting Commissioner of DOCCS, "legally responsible for the overall operation of [DOCCS] and each institution under its jurisdiction."  (*Id.* ¶ 4.)  Royce is GHCF's Superintendent and is responsible for its operation as well as the "welfare of [all] the inmates."  (*Id.* ¶ 5.)  Mazzalla is a Sergeant at GHCF, (*id.* ¶ 8), while Thomas, Brogan, and Matthews are correctional officers at GHCF, (*see id.* ¶¶ 6, 9, 11).

"Upon [Plaintiff's] arrival at [GHCF] in early [2017] around February/March, [he] met [Thomas] in G-Block housing area."  (*Id.* ¶ 13 (quotation marks omitted).)  Thomas informed Plaintiff that he had legal mail, prompting Plaintiff to step out of his cell and "walk[] down [his] company."  (*Id.*)  Once at his final destination, Plaintiff alleges Thomas informed Plaintiff that she was aware of his case, knew his family, and told Plaintiff "I know you['re] Innocent and Going Home."  (*Id.* (quotation marks omitted).)  Plaintiff alleges that Thomas proceeded to place Plaintiff's hand "on her behind," kiss him, touch him, and engage in intercourse.  (*Id.*)  Upon Plaintiff's objection, Thomas informed Plaintiff that it was a "direct order" and threatened Plaintiff that she would "scream [rape] and pull the [emergency] pin" if he failed to comply.  (*Id.*)  Plaintiff, scared for his life, complied with Thomas's sexual demands, which included oral sex and intercourse.  (*Id.*)

After the experience with Thomas, Plaintiff alleges that he was scared, embarrassed, and depressed.  (*See id.*)  Plaintiff also alleges, however, that this experience became routine, as Thomas regularly demanded Plaintiff engage in the same actions.  (*See id.*)  Plaintiff alleges that on several occasions, Plaintiff pleaded with Thomas to "leave [him] alone," but Thomas continued to request Plaintiff's compliance, threatening to kill him if he protested.  (*Id.*)

Eventually, Plaintiff decided to reach out to his attorney for help.  (*Id.*)  However, Plaintiff was still too scared and embarrassed to reveal to his attorney the underlying cause of his outreach, i.e. the repeated sexual assaults, choosing only to say that he "was in fear of [his] life due to the victim in [his] case['s] family member threatening to . . . harm me."  (*Id.*)  Plaintiff seems to allege that, out of fear, he concocted a scheme to obtain protection without revealing what Thomas was doing to him.  (*See id.*)  With assistance from Plaintiff's attorney, Plaintiff was removed from G-Block to "the West[s]ide (A-Block)."  (*Id.*)

Plaintiff alleges that his removal to cell block A lasted for a "few short months," as he was moved back to G-Block.  (*Id.*)  Plaintiff alleges, however, that he was moved to a separate company of G-Block, which he felt was safer vis-à-vis Thomas insofar as another officer was present, thereby making it difficult for Thomas to resume her sexual assaults.  (*Id.*)

In October 2018, Plaintiff's cousin had passed away, after which, Plaintiff alleges, Thomas reached out to Plaintiff, asking if he was "OK."  (*Id.*)  Plaintiff alleges that in response to her outreach, he "snapped on her and cursed at her to get away."  (*Id.*)  Plaintiff also alleges that Thomas began "to demand money . . . and started to threaten [him]."  (*Id.*)  Plaintiff alleges that Thomas' younger sister, Corrections Officer Huggins ("Huggins") "had officers falsely lock me up for [32] days during the (Christmas & New Year) Holidays."  (*Id.*)  Ultimately, Plaintiff alleges that he had the ticket pursuant thereto "dismissed."  (*Id.*)

Around this time, Plaintiff avers that he decided to come forward about the assaults.  (*Id.*)  Specifically, Plaintiff alleges that he wrote a letter to his mother.  (*Id.*)  Following receipt of this letter, Plaintiff's mother contacted Plaintiff's attorneys as well as DOCCS's Office of Special Investigations.  (*Id.*)  On or about December 28, 2018, Plaintiff met with Investigator Thorton, who assured Plaintiff that "he would get to the bottom" of the situation.  (*Id.*)

On February 1, 2020, Plaintiff alleges that he began to experience a post-traumatic stress disorder attack.  (*Id.* ¶ 15.)[2]  Plaintiff and his neighbors yelled to get corrections officers' attention and to be taken to the mental health department, but Plaintiff avers that he waited for over 30 minutes before Brogan responded.  (*Id.*)  Plaintiff informed Brogan of his "need to go to [m]ental-[h]ealth" and "to see the [s]ergeant on [d]uty."  (*Id.* (quotation marks omitted).)  Brogan initially refused to call the sergeant because it was "too late."  (*Id.*)  However, Brogan agreed when Plaintiff continued "yelling to see the [sergeant]," though Plaintiff alleges that Brogan cursed at Plaintiff and informed Plaintiff that he would write Plaintiff up and "keeplock[]" him. (*Id.*)  Plaintiff then states that Sergeant Cobb arrived 15 minutes later to escort Plaintiff to mental health and kept Plaintiff in handcuffs during the duration of the mental health visit, even after the nurse on duty had informed Cobb that Plaintiff was not harmful to himself and others in the facility.  (*Id.*)  Upon returning to his cell, Plaintiff noticed that his wrist was bleeding due to a cut from the "overly tight [h]andcuffs."  (*Id.*)  Plaintiff claims that he "still ha[s] permanent scars till this [d]ay."  (*Id.*)  The next morning, Plaintiff was served with a tier two ticket written by Brogan stating that Plaintiff had threatened him.  (*Id.*)  As a result, Plaintiff was keeplocked, and at the time Plaintiff filed this Action, had "yet to get any [d]isposition[] of the ticket."  (*Id.*)

Plaintiff asserts that on February 3, 2020, at or around 4pm in "E-Block #6 company," Thomas "stole [Plaintiff's] personal [and] [l]egal [m]ail" while she was working on Plaintiff's company.  (*Id.* ¶ 14.)  Later that day, Matthews walked past Plaintiff's cell and threatened Plaintiff because he had decided to sue, allegedly saying, "You wanna [sic] sue, I'll show you

---

[2] Plaintiff states that this attack occurred while he was in "'E-Block #6 company' at or around 8pm."  (Am. Compl. ¶ 15.)  However, Plaintiff does not indicate in his Amended Complaint when or under what circumstances he was removed from Cell Block G and placed in Cell Block E.  (*See generally Id.*)

tomorrow how nasty I can get!" (*Id.*)  The next morning, Plaintiff claims that he was told to "pack up [his] things and move to [G-Block]." (*Id.*)  Upon being escorted to G-Block by Ruiz, Plaintiff requested to see mental health professionals; Ruiz denied Plaintiff's request.  (*Id.*)  Plaintiff then found himself "housed [] on the same floor [that] [he] was []sexually assaulted [and] raped[] [and] had to walk past the same area [he] was abused." (*Id.*)  Thereafter, Plaintiff alleges, he was "keeplocked" and had four pairs of his sneakers thrown out by Matthews and Ruiz.  (*Id.*)  Upon returning to his cell, Plaintiff attempted to explain the "theft of [his] belongings" to Mazzalla, who proceeded to threaten Plaintiff, stating he would physically attack him "when the camera was '[off].'" (*Id.*)  Due to Plaintiff's fear, he requested to see a higher authority and was escorted by a lieutenant to the mental health department.  (*Id.*)

Plaintiff alleges he exhausted the grievance process (*id.* ¶ 16), and to that end, Plaintiff attached exhibits to the Amended Complaint, one dated February 3, 2020 regarding denial of medical care and legal mail and retaliation (*see id.* at 114–15 ("Retaliation Grievance dated February 3, 2020")), and one dated March 3, 2020 regarding retaliation and the ineffectiveness of the grievance department (*see id.* at 116–18 ("Retaliation Grievance dated March 3, 2020")).  Plaintiff also attaches several grievances in which he detailed several incidents of harassment from correctional officers that Plaintiff believes are retaliation for his complaints.  (*See generally id.* at 38–119.)  These incidents include: the intentional flooding of Plaintiff's cell by Thomas leading to the loss of Plaintiff's personal property, legal mail, and legal documents, (*see id.* at 61–63 ("Retaliation Grievance dated April 26, 2019")); stalking and overt threats, (*see id.* at 65, 66 ("Retaliation Grievance dated May 3, 2019")); and denial of notary services, (*see id.* at 86 ("Retaliation Grievance dated January 10, 2020")).

Since the incidents giving rise to his complaint, Plaintiff has been moved between different facilities and is currently located at Upstate Correctional Facility. (*See* Letter from Plaintiff to Court (May 25, 2021) (Dkt. No. 193); Letter from Plaintiff to Court (Oct. 19, 2021) (Dkt. No. 201); Letter from Plaintiff to Court (Dec. 9, 2021) (Dkt. No. 223).)

B.  Procedural History

Plaintiff commenced this Action by filing a Complaint against Annucci, Royce and Thomas on January 22, 2020.  (Compl. (Dkt. No. 2).)  On the same day, Plaintiff filed a motion for assignment of counsel.  (Mot. for Assign. of Counsel (Dkt. No. 3).)  Plaintiff reiterated his request for assignment of counsel in a letter filed on March 5, 2020.  (Letter from Plaintiff to Court (Feb. 29, 2020) (Dkt. No. 12).)  On April 2, 2020, the Court denied Plaintiff's request for assignment of counsel without prejudice.  (Order Den. Mot. to Appoint Counsel (Dkt. No. 21).) [3]

On March 30, 2020, Plaintiff filed an Amended Complaint, adding Cobb, Mazzalla, Brogan, Ruiz and Matthews as defendants.  (Am. Compl. (Dkt. No. 19).)  On November 3, 2020, First Defendants filed their Motion To Dismiss.  (*See* Mem. of Law in Supp. of Mot. ("First Defs.' Mem.") (Dkt. No. 148).)  Plaintiff filed his Opposition on November 30, 2020.  (*See* Mem. of Law in Opposition to Mot. to Dismiss ("Pl.'s Opp'n to First Mot.") (Dkt. No. 157).) First Defendants filed their Reply Memorandum in support of the Motion on December 22, 2020. (*See* Reply Mem. ("First Defs.' Reply") (Dkt. No. 163).) [4]

---

[3] The Court informed Plaintiff that he may renew his request at a later day should circumstances materially change. (*Id.* at 7.)  Since the initial denial of counsel, Plaintiff has made additional requests for appointment of counsel which have been denied for lack of a change in circumstances. (*See, e.g.,* Dkt. Nos. 98, 167, 323, 324, 332, 333, 335.)

[4] Plaintiff's Opposition to First Defendants' Motion to Dismiss and accompanying documents are contained within a letter addressed to Court dated November 10, 2020. (Letter from Plaintiff to Court (Nov. 30, 2020) (Dkt. No. 157).)  In the letter, Plaintiff requests the Court to enter default judgement against Matthews due to her failure to obtain representation and

On December 20, 2020, Second Defendants filed their Motion to Dismiss.  (*See* Mem. of Law in Supp. of Mot. ("Second Defs.' Mem.") (Dkt. No. 162).)  Plaintiff filed his Opposition on January 22, 2021.  (*See* Mem. of Law in Opposition to Mot. to Dismiss ("Pl.'s Opp'n to Second Mot.") (Dkt. No. 169).)  Second Defendants filed their Reply Memorandum in support of the Motion on February 5, 2021.  (*See* Reply Mem. ("Second Defs.' Reply") (Dkt. No. 176).)

On December 22, 2020, Plaintiff filed a letter requesting the Court dismiss Cobb, (Letter from Plaintiff to Court (Dec. 22, 2020) (Dkt. No. 164)), which the Court granted on December 31, 2020, (Order (Dkt. No. 166)).  In another letter filed on March 11, 2020, Plaintiff requested the Court dismiss Ruiz.  (Letter from Plaintiff to Court (Mar. 11, 2021) (Dkt. No. 187).)  The Court dismissed Ruiz on March 16, 2021.  (Order (Dkt. No. 188).)

On June 15, 2021, Plaintiff filed a letter requesting to voluntarily dismiss the case, (Letter from Plaintiff to Court (June 15, 2021) (Dkt. No. 195)), which the Court granted, (s*ee* Dkt. No. 196).  On July 27, 2021, Plaintiff requested his case be reopened, (Dkt. No. 196), which the Court granted, (*id*).[5]  In a letter filed on December 15, 2021, Defendants requested that the Court deem the filed Motions as fully briefed.  (Letter from Defendant to Court (Dec. 15, 2021) (Dkt. No. 226).)  The Court obliged, deeming the Motions fully briefed in reliance upon the briefing materials previously submitted.

On April 15, 2022, Matthews filed her Motion to Dismiss.  (*See* Mem. of Law in Supp. of Mot. ("Matthews Defs.' Mem.") (Dkt. No. 269).)  Plaintiff was ordered to submit his Opposition to Matthews' Motion by February 7, 2023.  (Dkt. No. 310.)  The Court extended Plaintiff's

---

respond.  (*Id.* at 1.)  Matthews has obtained representation and an appearance has been entered on her behalf.

     [5] Plaintiff's letter requesting was not filed separately on the Docket.

deadline to oppose to February 28, 2023, however Plaintiff did not file an opposition.  (Dkt. No. 332.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them.") (italics and quotation marks omitted).

B.  Analysis

It appears that Plaintiff attempts to plead two categories of claims: (1) claims under 42 U.S.C. § 1983, based on violations of his rights under the Constitution; and (2) state law tort claims for assault, battery, false imprisonment, and negligence.  (Am. Compl. ¶¶ 1, 18.) Defendants contend the Eleventh Amendment bars Plaintiff's claims against them in their official capacities.  (First Defs.' Mem. 3–4; Second Defs.' Mem. 13–14; Matthews Def.'s Mem. 18–20.)  First Defendants additionally argue that claims against Annucci and Royce should be dismissed for lack of personal involvement and on qualified immunity grounds, and that claims against Thomas regarding withholding of Plaintiff's mail should be dismissed.  (*See generally* First Defs.' Mem.)  Second Defendants and Matthews contend that Plaintiff failed to exhaust his administrative remedies.  (Second Defs.' Mem. 6–7; Matthews Def.'s Mem. 7–11.)  Second Defendants and Matthews additionally argue that Plaintiff has failed to state a constitutional claim against them and that they are entitled to qualified immunity.  (Second Defs.' Mem. 7–13; Matthews Def.'s Mem. 11–16.)  Matthews additionally argues that Plaintiff has no viable state law claim.  (Matthews Def.'s Mem. 16–18.)

1.  Annucci and Royce

Annucci and Royce argue that  Plaintiff has failed to allege they were personally involved in any constitutional violation and that they are entitled to qualified immunity.  (*See generally* First Defs.' Mem.)  This Court agrees.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Sterling v. Akinyombo*, No. 20-CV-10804, 2022 WL 2657223, at *4 (S.D.N.Y. July 8, 2022) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "[A] plaintiff must plead and prove that each

11

Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citation and quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because "Plaintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant) (quotation marks and citation omitted).  Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

Plaintiff has not made any specific allegations against Annucci or Royce in his Amended Complaint.  The claims against them in the Amended Complaint appear to be based entirely on the allegation that, as Acting Commissioner of DOCCS and Superintendent of Green Haven, Annucci and Royce were responsible for the operation of the facility.  (*See* Am. Compl. ¶¶ 4–5.)  In his Opposition, Plaintiff states that he "gave a detailed report to DOCCS [O]ffice of Special Investigations" and filed multiple grievances.  (Pl.'s Opp'n to First Mot. 2.)  Plaintiff appears to argue that Annucci and Royce were aware of the grievances, and they failed to protect him.  (*Id*.)  In the attachments to Plaintiff's Amended Complaint, there are multiple grievances where Annucci is included as a recipient of the grievance.  (*See* Am. Compl. 92, 104, 106.)  However, "[t]he receipt of letters or grievances, by itself, does not amount to personal involvement." *Leneau*, 2018 WL 566456, at *14–15 (citation and quotation marks omitted); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding DOCS Commissioner had no personal involvement when plaintiff wrote him two letters, one an appeal the Commissioner had referred to the prison superintendent for decision); *Allah v. Annucci*, No. 16-CV-1841, 2018 WL

4571679, at *6 (S.D.N.Y. Sept. 24, 2018) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." (quotation marks and citation omitted)); *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability." (italics, quotation marks, and citation omitted)).

Plaintiff additionally states in his Opposition to First Defendants' Motion that Annucci and Royce "created a policy or custom under which [Plaintiff's] constitutional rights were violated, or allowed such a policy or custom to continue." (Pl.'s Opp'n to First Mot. 2.) Specifically, Plaintiff contends that "Plaintiff being (denied/delayed) '[m]edical/[m]ental [h]ealth [s]ervices' was a (policy and/or custom)" that Annucci and Royce "implemented and never changed even when they were well aware of (Plaintiff's) 'grievances.'" (*Id.*) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by*, No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (internal citation omitted). Plaintiff appears to only allege a single instance of delayed mental health care in his Amended Complaint. (*See generally* Am. Compl.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under

§ 1983." *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013).

Accordingly, this single alleged instance of delay is insufficient to plausibly allege personal

involvement on the basis of a policy. *See Tubbs v. Venettozzi*, No. 19-CV-126, 2019 WL

2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made

aware of complaints about due process violations and allowed a custom of due process violations

in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler*,

43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part*, No. 11-CV-9102, 2014

WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly

"created or adopted" an unconstitutional policy were insufficient to plausibly allege personal

involvement "[w]ithout more than the allegations related to the single incident in the station

house").

      Plaintiff also seeks to establish personal liability by arguing that Annucci and Royce were

"grossly negligent" and did not "adequately supervise the subordinates who violated" his rights.

(Pl.'s Opp'n to First Mot. 3.)  However, the Second Circuit has made clear that in the wake of

*Iqbal*, plaintiffs cannot rely on supervisory liability to establish personal involvement.  *Tangreti*,

983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even

grossly negligent, in her supervision of the correctional officers or in failing to act on the

information she had" for the purposes of personal involvement).

      Plaintiff additionally attaches grievances filed against Royce to his Amended Complaint.

(Am. Compl. Ex. B, E, F, 72, 75, 77, 82, 114.)  One grievance is for harassment, retaliation, and

unprofessional conduct dated December 13, 2019, (Am. Compl. Ex. B), another for denial of

notary services dated January 10, 2020 (Am. Compl. Ex. E), two for denial of medical care dated

November 29, 2019 (Am. Compl. Ex. F) and December 4, 2019 (Am. Compl. 77), another for

harassment and retaliation dated November 13, 2019 (*id*. at 72), another for security failure (*id*. at 75), one for retaliation, denial of shower and phone and unprofessional conduct dated December 20, 2019 (*id*. at 82), and one for retaliation and denial of mental health services dated February 3, 2020 (*id*. at 114).  However, these grievances do not specifically detail any allegations against Royce, thus, insofar as Plaintiff relies on these grievances to establish Royce's personal involvement, Plaintiff's constitutional claims against Royce must fail because "complaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim."  *Leneau*, 2018 WL 566456, at *15 (dismissing a defendant for lack of personal involvement because "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant) (quotation marks and citation omitted); *see also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In the absence of any specific allegation establishing Annucci and Royce's personal involvement in any alleged violation, Plaintiff's constitutional claims against them cannot survive.  *Haywood v. Annucci*, No. 18-CV-10913, 2020 WL 5751530, at *5 (S.D.N.Y. Sept. 25, 2020) (dismissing claims against Annucci for failure to allege personal involvement when the plaintiff "offer[ed] no factual allegations suggesting that Annucci was present for, knew of, or even had any reason to know about the alleged" constitutional violation); *Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation) (citation omitted); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11

(S.D.N.Y. Mar. 29, 2018) (finding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

### 2.  Thomas

Plaintiff alleges that on February 3, 2020, Thomas stole his personal and legal mail. (Am. Compl. ¶ 14).  Thomas moves to dismiss claims against her regarding denial of mail.  (First Defs.' Mem. 6.)

"To state a claim for denial of access to the courts — in this case due to interference with legal mail — a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citation and quotation marks omitted).  "[A] plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)).  Actual injury includes "claims that systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time," and "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002) (collecting specific examples within each category).  "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *5 (S.D.N.Y. Mar. 27, 2019) (quotation marks and citation omitted).

Plaintiff does not allege that he was prevented, or even delayed, from making legal filings.  More to the point, there is no claim that Thomas "obstruct[ed] [Plaintiff's] legitimate efforts to seek judicial redress" or otherwise prejudiced Plaintiff's legal actions.  *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008) (citation, alteration, and quotation marks omitted); *see also Christopher*, 536 U.S. at 413 (noting right-of-access concerns are implicated when "systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time").  Accordingly, Plaintiff's access-to-courts claim fails.  *See Matthews v. Barq*, No. 18-CV-855, 2019 WL 1025828, at *10 (N.D.N.Y. Mar. 4, 2019) (dismissing access-to-courts claim alleging that the defendant "denied [the plaintiff] access to a legal bag prior to his transport to another facility, and that certain legal materials within the bag were subsequently removed," where no showing of actual injury was made); *Wisdom v. Griffin*, No. 17-CV-4837, 2019 WL 452057, at *4 (S.D.N.Y. Feb. 4, 2019) (dismissing access-to-courts claim where the plaintiff did "not allege he was prevented from bringing his habeas corpus petition — which plaintiff in fact successfully filed, and which remains pending — or that any existing legal claim would have succeeded but irreparably was harmed by a defendant's alleged conduct") (citation omitted); *Chavis v. Chappius*, No. 06-CV-543, 2015 WL 1472117, at *10 (W.D.N.Y. Mar. 31, 2015) (dismissing access-to-courts claim where the plaintiff failed to allege that he "was actually hindered or prejudiced by the denial of a legal advance"); *Simmons v. Adamy*, 987 F. Supp. 2d 302, 307–08 (W.D.N.Y. 2013) (dismissing access-to-courts claim where, "[b]y plaintiff's own reckoning, he received an average of at least one or two library call-outs per week," which is "inherently reasonable," and where he "offer[ed] no evidence that he was harmed by the lack of more frequent law library access"); *Rivera v. Pataki*, No. 04-CV-1286, 2005 WL 407710, at *18

(S.D.N.Y. Feb. 7, 2005) (dismissing access-to-courts claim where the "plaintiff [did] not specify any injury").

Plaintiff also alleges interference with his personal mail.  (Am. Compl. ¶ 14).  "[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."  *Davis*, 320 F.3d at 351.  "[C]ourts have consistently afforded greater protection to legal mail than to non-legal mail."  *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (quoting *Davis*, 320 F.3d at 351).  A prisoner's rights to send and receive mail may be regulated if it is "reasonably related to legitimate penological interests."  *Id*. (quoting *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir. 1987)).

To show a plaintiff's First Amendment right is violated, a "prisoner must show that the interference with his mail was both regular and unjustified."  *Antrobus v. City of N.Y.*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014).  Indeed, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation. "Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'"  *Davis*, 320 F.3d at 351 (quotation marks and citations omitted).

Here, Plaintiff has alleged a single incident of interference with his personal mail on February 3, 2020, where Thomas allegedly stole Plaintiff's personal mail.  (Am. Compl. ¶ 14.)  Accordingly, Plaintiff has not sufficiently alleged the interference with his mail was both regular and unjustified and the claim is therefore dismissed.  *Genao v. City of N.Y.*, No. 20-CV-2441, 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (holding two alleged instances of mail interference did not sufficiently allege a First Amendment mail interference claim).[6]

---

[6] In his Opposition, Plaintiff alleges that he has been deprived of his mail for many years. (Pl.'s Opp'n to First Mot. 7.)   However, Plaintiff does not explain who has been responsible for the deprivation, and instead states that this denial was done by "Defendants."  (*Id*.)

### 3. Matthews

#### a. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). This requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so *properly* . . . . Proper exhaustion demands compliance with a prison grievance system's deadlines and other critical procedural rules." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and quotation marks omitted) (emphasis in original).

To satisfy the exhaustion requirements, a prisoner "must exhaust all levels" of DOCCS's "Inmate Grievance Program" ("IGP"). *Little v. Mun. Corp., City of N.Y.*, No. 12-CV-5851, 2017 WL 1184326, at *11 (S.D.N.Y. Mar. 29, 2017). The IGP provides for a three-step grievance process. *See* 7 N.Y.C.R.R. § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative

---

"[C]omplaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Leneau*, 2018 WL 566456, at *15 (quotation marks and citation omitted).

remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))).  Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence.  *See* 7 N.Y.C.R.R. § 701.5(a)(1).  Once filed, the representatives of the IGRC have up to 16 calendar days to resolve the grievance informally.  *Id.* § 701.5(b)(1).  If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii).  The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the IGRC's written response.  *See id.* § 701.5(c)(1).  The third and final step is to appeal the superintendent's decision to the Central Office Review Committee ("CORC"), which the prisoner must do within seven days of the superintendent's written response to the grievance.  *Id.* § 701.5(d)(1)(i).

For grievances involving harassment, the procedure and timeline are slightly different: the grievance is sent to the superintendent who determines whether the grievance would represent a bona fide case of harassment.  7 N.Y.C.R.R. § 701.8(c).  If the grievance does constitute a harassment grievance, the superintendent must then rule on the grievance within 25 days calendar days, and if the inmate wishes to appeal that ruling, the inmate must appeal to CORC within seven calendar days after receipt of the ruling, or if the superintendent does not rule, then within seven calendar days of the end of the twenty-five day period.  *Id*. §§ 701.8(e)– (h).

Given the aforementioned requirement to exhaust all levels of administrative remedies, *see Little*, 2017 WL 1184326, at \*11, "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted," *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008). Alternatively, "an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

However, the PLRA "contains its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642. As the Supreme Court has explained "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies. . . . an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 738).

The Supreme Court has identified at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, an "administrative procedure is unavailable when . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 643–44. Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but has declined to "opine on what other circumstances might render an otherwise

available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2. Nonetheless, these three circumstances "guide the Court's inquiry." *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Failure to exhaust is an affirmative defense. *See Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009). As with other affirmative defenses, therefore, dismissal may be granted at the pleading stage for failure to exhaust if the defense "appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see also Hosannah v. Nassau Cnty. Crim. Supreme Ct. Sergeant Officer*(s), No. 16-CV-1045, 2017 WL 3207966, at *5 (E.D.N.Y. July 5, 2017) ("Despite the fact that Plaintiff is not required to plead exhaustion, non-exhaustion may be apparent on the face of a complaint, thereby warranting dismissal."), *report and recommendation adopted sub nom. Hosannah v. Sposato,* No. 16-CV-1045, 2017 WL 3207750 (E.D.N.Y. July 26, 2017).

### i.  Exhaustion of Administrative Remedies

Plaintiff attached to the Amended Complaint his grievance filed against Matthews, dated March 3, 2020, which alleges that Matthews stole his sneakers. (Am. Compl. 116–18.) This filing with the IGP was untimely because it is more than 21 days after the alleged incident, which occurred on February 4, 2020, according to both the Amended Complaint (*id*. at ¶ 14) and the grievance (*id*. at 116-18). An untimely filing with the IGP fails to exhaust administrative remedies under the PLRA. *Woodford v. Ngo*, 548 U.S. 81, 83–84, 90–91 (2006) (holding that "proper exhaustion of administrative remedies is necessary" therefore "filing an untimely or otherwise procedurally defective administrative grievance" does not satisfy the exhaustion requirement); *Gottesfeld v. Anderson*, No. 18-CV-10836, 2020 WL 1082590, at *9 (S.D.N.Y. Mar. 6, 2020) (dismissing claims related to grievance because that grievance was untimely).

Nothing in Plaintiff's March 3, 2020 grievance against Matthews indicates that he had filed an earlier grievance that would have been timely. Accordingly, Plaintiff failed to exhaust his administrative remedies against Matthews as to the sneaker incident because he failed to file a timely grievance. However, as Plaintiff has not attached a grievance regarding Matthews' alleged threat in retaliation for the lawsuit Plaintiff filed against other corrections officers, the Court cannot determine whether Plaintiff properly exhausted that claim against Matthews, and therefore cannot dismiss on that basis. *See Miller v. Annucci*, No. 17-CV-4698, 2019 WL 4688539, at *12 (S.D.N.Y. Sept. 26, 2019) (holding that because the "[c]ourt [] cannot be certain from the pleadings alone that it has all the relevant grievances necessary to determine whether Plaintiff exhausted" his claims, it could not grant a motion to dismiss on the basis of exhaustion).

Additionally, courts routinely dismiss claims as a matter of course when it would have been temporally impossible for the plaintiffs to have exhausted their administrative remedies before filing the complaints. *See Amaker v. Bradt*, 745 F. App'x 412, 413 (2d Cir. 2018) (holding that plaintiff could not have exhausted where "he filed the complaint at issue here 11 days after filing the grievance"); *Gayot v. Perez*, No. 16-CV-8871, 2018 WL 6725331, at *6 (S.D.N.Y. Dec. 21, 2018) (holding that it was clear from the date of an appeal to the CORC, which occurred seven days after the date of the filing of the initial complaint, that the plaintiff could not have exhausted all administrative remedies); *Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *3 (S.D.N.Y. June 11, 2015) (dismissing for failure to exhaust where the plaintiff stated in his complaint that he had not appealed from the "first step of the IGRP's administrative procedure" and the plaintiff filed his complaint only one week after the incident occurred); *Pierre-Louis v. Martinez*, No. 12-CV-2240, 2014 WL 4161960, at *4 (E.D.N.Y. Aug. 19, 2014) (holding that "it is apparent from the face of the [c]omplaint" that plaintiff did not exhaust all

administrative remedies because it was filed "a mere three weeks after the alleged date of the incident"); *Price v. City of N.Y.*, No. 11-CV-6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) (same).

Accordingly, even if Plaintiff had timely filed his grievance, he did not exhaust his administrative remedies as to the sneaker incident because he filed his Amended Complaint with this Court before his grievance could be resolved by prison officials.  A plaintiff's complaint is considered filed as of the date it was given to the prison official for forwarding, and "the Court assumes that [the prisoner] gave his petition to prison officials for mailing on the date he signed it." *Johnson v. Coombe,* 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) (alteration in original) (quotation marks and citation omitted). Plaintiff's Amended Complaint is dated March 13, 2020. It includes a letter dated March 13, 2020 to the Court's Pro Se Office, and a post-marked envelope of the same date to the same office, indicating that he mailed the Amended Complaint for filing through the prison system on March 13, 2020.  (Am. Compl. 120-21.)  That is only 10 days after the date of his grievance against Matthews.  Plaintiff has not plausibly alleged he completed New York's three-step IGP program within 10 days.  *Wing v. Myers*, No. 18-CV-11056, 2019 WL 6732967, at *5 (S.D.N.Y. Dec. 11, 2019) (holding that it was "clear from the face of the complaint" that plaintiff failed to exhaust when his complaint was filed without sufficient time to exhaust all levels of the IGP process).

ii.  Availability of Administrative Remedies

Once a defendant has met the burden of demonstrating that a grievance process exists, the plaintiff bears the burden of "demonstrating that other factors rendered a nominally available procedure unavailable as a matter of fact." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (alterations omitted).  Plaintiff writes in his grievance against Matthews,

attached to the Amended Complaint, that the grievance process is "basically non-existent, nobody follows up on your complaint," and grievances are denied "without anything in writing nor any reason why denied." (Am. Compl. 116-17.) His grievance additionally states that the sergeants "'[t]hreaten' you by calling you to come see them . . . and several officers threaten you to sign-off on your grievance." (*Id.*) Construing Plaintiff's Amended Complaint liberally, the Court interprets these statements as allegations that administrative remedies were not available to Plaintiff.

To constitute an "available" remedy, a process requires only "the possibility of some relief." *Ross*, 578 U.S. at 643 (quotation marks and citation omitted). Accordingly, to claim a grievance process operated as a dead end, a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. New York State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022). Indeed, the example provided by the Court in *Ross* as a dead end involved a scenario where a prison handbook directed inmates to submit grievances to a particular administrative office when, in practice, the office disclaimed the capacity to consider grievances. *Ross*, 578 U.S. at 643.

Plaintiff has not shown that the grievance process "operates as a simple dead end." *Id.* He has provided no facts suggesting that the IGP cannot produce results. Even assuming that Plaintiff has filed initial grievances which have received no response, "this alone is insufficient to show that the IGRP acted as a mere dead end," especially "in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance." *Mena v. City of N.Y.*, No. 13-CV-2430,

2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016); *see also Massey v. Sapp*, No. 19-CV-11902, 2021 WL 4461825, at *4 (S.D.N.Y. Sept. 29, 2021) (holding that receiving no response to previous grievance is insufficient to show grievance procedure is dead end).

Moreover, Plaintiff has attached to his Amended Complaint documentation regarding many grievances he has filed which demonstrate that his grievances have received responses and determinations. For example, Plaintiff's attachments demonstrate that he was given a hearing for a grievance on April 25, 2019, (Am. Compl. 64), he received a ruling denying a grievance he made about telephone access that he appealed, (*id*. at 44), and he received an Acknowledgement of Receipt for a grievance he filed about roaches in March 2019, (*id*. at 57). Plaintiff also attached a response to a grievance dated October 18, 2018, in which the IGP Supervisor returned a grievance to Plaintiff for him to supplement and resubmit because the original grievance did not request action. (*Id*. at 102.) Plaintiff included the returned grievance which shows that, in fact, it did not request action. (*Id*. at 99–100.) Plaintiff additionally attached to his Amended Complaint a memorandum from Captain Norton, dated January 15, 2019, responding to Plaintiff's complaint about a misbehavior report against Plaintiff that resulted in Plaintiff being placed on Pre-hearing confinement status. (*Id*. at 88.) The memorandum states, "[t]his misbehavior Report was dismissed at a later date and you were released as a result." (*Id*.) That Plaintiff provides documentation demonstrating that he has successfully filed several grievances, that determinations were made, and that he received responses to his grievances, undermines his assertion that the grievance process is "basically non-existent, nobody follows up on your complaint," and grievances are denied "without anything in writing nor any reason why denied." (*Id*. at 116-17.) *See Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) (summary order) ("[S]everal of his past grievances containing the notation "Grievance Accepted"—undermines

his argument that prison staff had made the prison grievance system a dead end by not collecting and processing grievances as required."); *Cicio v. Alvarez*, No. 19-CV-9883, 2022 WL 1003796, at *5 (S.D.N.Y. Apr. 4, 2022) ("[T]he superintendent and CORC considered and ruled on Plaintiff's petitions, albeit belatedly; his pleas did not go into a black hole.").

Furthermore, courts have found that affirmative participation in the grievance process demonstrates that the grievance process is not a dead end.  *See, e.g.*, *Smith v. Jaynes*, No. 18-CV-1107, 2022 WL 686627, at *3 (N.D.N.Y. Feb. 18, 2022) ("[A plaintiff's prior filing of grievances] shows that [the] [p]laintiff did not view the filing of grievances as a dead end." (quotation marks and citation omitted)); *Lapierre v. LaValley*, No. 15-CV-1499, 2019 WL 4015689, at *5 (N.D.N.Y. Aug. 26, 2019) (holding that the plaintiff's prior filings "show[ ] that [he] did not view the filing of grievances as a dead end" (citation omitted)), *report and recommendation adopted*, 2019 WL 4686415 (N.D.N.Y. Sept. 26, 2019), *aff'd*, 847 F. App'x 47 (2d Cir. 2021); *Gonzalez v. Coburn*, No. 16-CV-6174, 2017 WL 6512859, at *5 (W.D.N.Y. Dec. 20, 2017) (holding that the plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was not a dead end).  Not only did Plaintiff affirmatively participate in the grievance process on multiple occasions, he also (1) filed a grievance on February 3, 2020 regarding some of the incidents alleged in the Amended Complaint (Am. Compl. 114) and (2) filed a grievance about the particular incident at issue here, albeit untimely, demonstrating that he did not view the filing of grievances as a dead end, *Whittington v. Ponte*, No. 16-CV-1152, 2020 WL 2750372, at *9 (S.D.N.Y. May 27, 2020) (holding that the fact that plaintiff filed grievances contemporaneously with the challenged incidents "cuts strongly against any theory of unavailability").

Plaintiff's intimidation claim fails for similar reasons.  Courts in the Second Circuit hold that "when an inmate files a grievance, notwithstanding the threats of retaliation and intimidation of which that inmate complains, the failure to fully exhaust under the PLRA will not be excused on this ground."  *Cicio*, 2022 WL 1003796, at *5 (quotation marks and citation omitted).  Accordingly, that Plaintiff filed a grievance on February 3, 2020 and then later filed a grievance regarding Matthews' conduct undermines any contention that intimidation prevented Plaintiff from using the grievance process.  *Grant v. Kopp*, No. 17-CV-1224, 2019 WL 368378, at *6 (N.D.N.Y. Jan. 3, 2019) (holding administrative remedies were available when "[d]espite any threats that plaintiff allegedly perceived, he nonetheless filed a grievance"), *report and recommendation adopted*, No. 17-CV-1224, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019); *McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. 2017) (summary order) ("Appellant asserted that defendants tried to intimidate him, and intimidation can excuse the failure to exhaust.  However, none of the actions allegedly taken by the defendants actually prevented Appellant from submitting his complaint letter.  Appellant was able to take the first step in the grievance process." (citations omitted)).

### b.  First Amendment Retaliation

Plaintiff also alleges that Matthews threatened him in retaliation for the lawsuit Plaintiff filed against other corrections officers.  (Am. Compl. ¶ 14.)

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right."  *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *13 (S.D.N.Y. Mar. 18, 2019) (citation and quotation marks omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action

28

against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted).

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (quotation marks and citation omitted).  In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id*. (citation, alterations, and quotation marks omitted omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (citation and quotation marks omitted).  Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations" and not stated in "wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation and quotation marks omitted); *Tutora*, 2019 WL 1382812, at *6 (same).

"[V]erbal threats may qualify as adverse actions" in the prison retaliation context *only* where they are "sufficiently specific and direct." *White v. Westchester Cnty.*, No. 18-CV-730, 2018 WL 6726555, at *17 (S.D.N.Y. Dec. 21, 2018) (quotation marks and citation omitted)

(collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018) (same); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (explaining that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); *Hofelich v. Ercole*, No. 06-CV-13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) (concluding that "whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered" (citation and quotation marks omitted)).

Matthews' alleged comment to Plaintiff, "You wanna sue, I'll show you tomorrow how nasty I can get," is insufficiently specific, direct, and detailed enough to constitute an adverse action.  (Am. Compl. ¶ 14.); *See Tutora*, 2019 WL 1382812, at *7 (holding the statement "I have a 16 inch rope with your name on it.  I was a slave owner for Halloween," while reprehensible, was "insufficiently specific, direct, and detailed enough to state a First Amendment claim"); *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (dismissing First Amendment retaliation claims because an officer's statements to a plaintiff that his "grievances were unlikely to succeed" and that he "would handle things 'his way'" were insufficiently specific or direct (citation and quotation marks omitted)); *Barrington v. N.Y.*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that "'me and my boys . . . going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment . . . that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his . . . comment that '[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations

omitted)), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (finding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *cf. White*, 2018 WL 6726555, at *18 ("This allegation constitutes a specific, clear threat made in response to [the p]laintiff's prospective grievance against [the d]efendant. . . . [The defendant] threatened physical harm to [the p]laintiff, and did so with particularity, by pointing to the inmates who would harm [the p]laintiff and explaining why they would harm him at her direction."). Accordingly, Plaintiff's retaliation claim against Matthews is dismissed.

### 4. Brogan

Plaintiff alleges in the Amended Complaint that Brogan was deliberately indifferent to his medical needs and retaliated against him for making a request for medical treatment by issuing him a "tier two" ticket which resulted in him being keeplocked. (Am. Compl. ¶ 15.) In his Opposition to Second Defendants' Motion, Plaintiff also alleges that Brogan retaliated against Plaintiff for filing a grievance against Thomas. (Pl.'s Opp'n to Second Mot. 1.)

### a. Exhaustion

Brogan argues that because Plaintiff commenced his action against Brogan 43 days after the alleged incident with Brogan, Plaintiff cannot have exhausted his administrative remedies. (Second Defs.' Mem. 5–6.) However, none of the cases that Brogan cites stands for the proposition that an action commenced 43 days after an alleged incident demonstrates that lack of exhaustion is apparent on the face of a complaint. (*Id.*) "Courts have concluded that *as much as* 21 days between the underlying event and filing of the complaint clearly indicates that the petitioner failed to exhaust." *Caraballo v. Dep't of Corr. City of N.Y.*, No. 22-CV-971, 2022 WL 16555313, at *3 (S.D.N.Y. Oct. 31, 2022) (emphasis added); *McKinney v. City of N.Y.*, No. 19-

CV-5320, 2020 WL 5775664, at *4 (S.D.N.Y. July 23, 2020) (dismissing complaint for failure to exhaust where only three weeks elapsed between the filing of the grievance on May 6, 2019 and signing of the complaint on May 28, 2019), *report and recommendation adopted*, 2020 WL 5775194 (S.D.N.Y. Sept. 28, 2020); *Miller,* 2019 WL 4688539, at *12 (noting that courts dismiss claims for lack of exhaustion when the "period between the date of the alleged incident and the filing of the complaint was 21 or fewer days"); *Price v. City of N.Y.*, No. 11-CV-6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) ("[G]iven the timelines for the grievance procedure outlined in the DOC's regulations, it would have been impossible for him to do so in the 21 days between the alleged incident and the filing of his complaint."). This Court has not found a case where lack of exhaustion was demonstrated on the face of the complaint on the basis that the complaint was filed 40 or more days after the alleged incident. Accordingly, Brogan has not carried his burden of demonstrating Plaintiff failed to exhaust this claim before he filed the Complaint.[7]

### b.  Deliberate Indifference to Medical Needs

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To state a claim of deliberate indifference, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (citations omitted).

---

[7] Mazzalla's identical exhaustion argument, namely that Plaintiff commenced his action against Mazzalla only 41 days after the alleged incident involving Mazzalla, fails for the same reason. (Second Defs.' Mem. 5–6.)

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id*. at 280 (citation omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id*. (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis omitted) (citation and quotation marks omitted); *see also James v. Brown*,

No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)).   "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.'" *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186).   "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases).   Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188.   However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.'" *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

Plaintiff has only alleged that Brogan did not respond to his request for medical attention for 30 minutes and that once Brogan agreed to send Plaintiff to medical care, an officer arrived 15 minutes later to escort Plaintiff to mental health.   (Am. Compl. ¶ 15.)   Plaintiff has not shown that this brief delay exposed him to an unreasonable risk of harm, caused extreme pain, or exacerbated a serious illness.   Accordingly his claim must be dismissed.   *See Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 658 (E.D.N.Y. 2021) (holding that while six-day delay before plaintiff received a substitute pain medication caused plaintiff some degree of pain or discomfort,

that brief delay is not constitutionally deficient where plaintiff suffered neither death nor

degeneration of his condition); *Johnson v. City of N.Y.*, No. 12-CV-8265, 2014 WL 5393181, at

*6 (S.D.N.Y. Oct. 21, 2014) ("Even assuming that plaintiff suffered a hairline fracture to his

ankle, he has provided no evidence that the four and one-half hour delay between his arrest and

his being seen [ ] resulted in any worsening of his condition or resulted in the exacerbation of his

injury."), *report and recommendation adopted*, 12-CV-8265, 2014 WL 6455162 (S.D.N.Y. Nov.

17, 2014), *aff'd*, 633 F. App'x 37 (2d Cir. 2016); *Ferguson,* 2012 WL 2865474, at *4 (holding

plaintiff failed to satisfy objective prong based on one-day delay in receiving insulin, which

caused temporary blindness, pain, and swelling in leg).

### c.  First Amendment Retaliation

 Brogan argues that a request for medical attention is not protected activity, or, at

minimum that he is entitled to qualified immunity regarding Plaintiff's retaliation claim.

(Second Defs.' Mem. 9.)  "The doctrine of qualified immunity protects government officials

from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).  Qualified immunity

shields a defendant from standing trial or facing other burdens of litigation "if either (a) the

defendant's action did not violate clearly established law, or (b) it was objectively reasonable for

the defendant to believe that his action did not violate such law."  *Johnson v. Newburgh

Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (quotation marks and citation omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity

defense, a court may begin by examining whether a reasonable officer in Defendant's position

would have believed his or her conduct would violate the asserted constitutional right.  *See*

*Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").  The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted).  Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id*. at 665 (citations and quotation marks omitted).  Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

Given that "qualified immunity is not only a defense to liability, but also provides immunity from suit," a court should resolve a "defendant's entitlement to qualified immunity . . . 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32).  "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)).  As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a

motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 (quotation marks omitted).

Brogan argues that a prisoner's right to seek or demand medical attention has not been clearly established.  (Second Defs.' Mem. 9.)  The Court agrees.  *See Brown v. White*, No. 08-CV-200, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010) ("The court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention[,] and courts in the Second Circuit have not decided the issue."); *see also Gilmore v. Blair,* No. 18-CV-463, 2020 WL 5792467, at *5 (N.D.N.Y. June 30, 2020) ("Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim.") , *report and recommendation adopted*, No. 18-CV-463, 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020); *Ross v. Koenigsmann*, No. 14-CV-1321, 2016 WL 11480164, at *18 (N.D.N.Y. Sept. 8, 2016) ("[T]he [c]ourt is aware of no authority holding that [an] inmate's request for medical attention is protected conduct under the First Amendment."), *report and recommendation adopted adopted by* 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016).  Indeed, when faced with such a claim, district courts in the Second Circuit frequently assume, but do not decide, that requests for medical attention are protected by the First Amendment for the purpose of analyzing the merits of a retaliation claim.  *See, e.g., Green v. Venettozzi*, No. 14-CV-1215, 2019 WL 624922, at *2 (N.D.N.Y. Feb. 14, 2019) (noting that the magistrate judge "assumed for the purposes of the motion[ ] that [the] plaintiff's request [for medical treatment] constitute[d] protected activity" (quotations and alteration omitted)); *Brown*, 2010 WL 985184, at *13 ("We will assume, for the purpose of the motion for summary judgment with respect to a retaliation claim, that the First Amendment recognizes an inmate's

right to demand necessary medical care or complain about inadequate care."); *Maxwell v. City of N.Y.*, 272 F. Supp. 2d 285, 299–300 (S.D.N.Y. 2003) (noting the absence of relevant Second Circuit authority, and stating, "one court in this district held that although doubtful that a prisoner has a protected interest in repeatedly complaining about medical ailments, the protected nature of a right to seek basic medical treatment is assumed" (citation omitted)), *aff'd in part*, *vacated in part*, 380 F.3d 106 (2d Cir. 2004).  Given the absence of guidance from the Supreme Court and the Second Circuit, Brogan is entitled to qualified immunity "because there is no 'clearly established right' under the First Amendment for inmates to request medical attention." *Ross*, 2016 WL 11480164, at *18; *see James v. Gage*, No. 15-CV-106, 2019 WL 6251364, at *7 (S.D.N.Y. Nov. 21, 2019) (holding defendant was entitled to qualified immunity because "a constitutional right to request medical attention is not clearly established").

Plaintiff additionally alleges in his Opposition that "Mazzalla, Brogan, [and] Ruiz maliciously [i]ntentionally [r]etaliated/[h]arassed" Plaintiff for his filing a grievance against Thomas.  (Pl.'s Opp'n to Second Mot. 1.)

In determining whether there is a causal connection between a protected activity and an adverse action, "a court may infer an improper or retaliatory motive in the adverse action from: the temporal proximity of the protected activity and the adverse action . . . and statements by the defendant regarding his motive for injuring the plaintiff."  *Lovett v. Bennett*, No. 22-CV-5462, 2022 WL 2986776, at *4 (S.D.N.Y. July 27, 2022) (alterations, quotation marks, and citation omitted).  Here, Plaintiff has not provided any statements that would tie Brogan's actions to Plaintiff's filing of grievances against Thomas, nor has he alleged that Brogan knew of Thomas or the grievance against her.  Additionally, while it is not entirely clear precisely when his grievance against Thomas was filed, an attachment to the Amended Complaint indicates that

Plaintiff "reported [his] [g]rievance to []Investigator[] []Thorton[] of the []DOCCS Office of Special Investigations[] on 12/28/2018." (Am. Compl. 117.) Accordingly, it appears that the alleged protected activity occurred over a year before the February 2020 allegations against Brogan, which courts have held is insufficient to establish a causal connection. *Girard v. Cuttle*, No. 15-CV-187, 2018 WL 4190140, at *7 (N.D.N.Y. Aug. 10, 2018) (holding nine months between protected activity and the alleged retaliation was not indicative of a causal connection), *report and recommendation adopted sub nom. Girard v. Chuttey*, No. 15-CV-187, 2018 WL 4188431 (N.D.N.Y. Aug. 31, 2018), *aff'd*, 826 F. App'x 41 (2d Cir. 2020); *Crawford v. Braun*, No. 99-CV-5851, 2001 WL 127306, at *6 (S.D.N.Y. Feb. 9, 2001) (describing a lapse of seven months as too "attenuated" for purposes of temporal proximity). Accordingly, because Plaintiff has not alleged any causal connection between his grievance against Thomas and Brogan's actions, the retaliation claim fails. *See Lovett*, 2022 WL 2986776, at *4 (holding causal connection not sufficiently alleged when it was unclear that there was temporal proximity between the protected activity and adverse action or that plaintiff was threatened "*because of* his previous testimony") (emphasis in original); *Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *11 (S.D.N.Y. Mar. 27, 2015) (granting motion to dismiss retaliation claim where plaintiff "fail[ed] to allege any facts that would support a finding that [the defendants] were personally motivated by the dismissal of an earlier grievance they have no apparent connection with"); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 517 (S.D.N.Y. 2012) (holding that "repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of retaliatory animus on the part of the defendants," without "any specific and detailed factual allegations to support that assertion," is insufficient to establish a causal connection, particularly given the higher scrutiny applied in the prison context (quotation marks and citations)); *Bouknight v. Shaw*, No. 08-CV-

5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that the

defendant "wrote me up for revenge" is "mere speculation" and therefore insufficient to

plausibly establish "the requisite causal connection").[8]

### 5.  Mazzalla

Plaintiff's sole allegation against Mazzalla in the Amended Complaint is that after

Plaintiff attempted to explain the theft of his belongings to Mazzalla, Mazzalla threatened

Plaintiff, stating he would physically attack Plaintiff when his body camera was off.  (Am.

Compl. ¶ 14.)  In a single three sentence paragraph, Mazzalla simply contends that a verbal

threat is insufficient as a matter of law to state a constitutional claim.  (Second Defs.' Mem. 12.)

It is true that courts have held "[v]erbal harassment or threats alone do not constitute a violation

of any federally protected right and are therefore not actionable pursuant to 42 U.S.C. § 1983."

*Lawtone-Bowles v. Katz*, No. 14-CV-606, 2016 WL 6834018, at *8 n. 12 (S.D.N.Y. Nov. 17,

2016); *see also Khalil v. City of N.Y.*, No. 17-CV-1729, 2019 WL 1597315, at *5 (E.D.N.Y. Apr.

15, 2019) ("Verbal threats alone are insufficient to give rise to a constitutional violation that is

cognizable under § 1983.").  However, while true that a verbal threat *alone* is not actionable

under Section 1983, verbal threats can constitute adverse actions in the retaliation context.  *See*

*Stapleton v. Pagano*, No. 19-CV-952, 2020 WL 4606320, at *6 (S.D.N.Y. Aug. 11, 2020)

(noting that "verbal threats may qualify as adverse actions" in the prison retaliation context);

*White*, 2018 WL 6726555, at *17 (same).  Mazzalla does not address the possible claim that

Mazzalla's threat was made in retaliation for Plaintiff's reporting his belongings stolen by an

officer.  Given that Second Defendants fail to address this claim in their Memorandum, the Court

will not dismiss this claim here because "it is not sufficiently argued by Defendants, who are

---

[8] Plaintiff's identical retaliation claim against Mazzalla fails for the same reason.

represented by counsel and attempting to dismiss a pro se [Amended] Complaint." *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018) (citation and quotation marks omitted); *see also Am. Tissue, Inc. v. DLJ Merch. Banking Partners, II, L.P.*, No. 03-CV-6913, 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (dismissing claims with prejudice because the party's brief "fail[ed] to address with any seriousness the legal sufficiency of those claims").[9]

### 6.  Official Capacity

All Defendants argue claims against them in their official capacity are barred by the Eleventh Amendment.  (See First Defs.' Mem.; Second Defs.' Mem.; Matthews Defs.' Mem.) The Court agrees.

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983.  *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977); *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (same).  "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F. 3d at 366 (quotation marks and citation omitted).  The Eleventh Amendment therefore also bars the claims

---

[9] Similarly, Second Defendants simply state that Mazzalla is "entitled to qualified immunity because reasonable officials in [his] position[] could have reasonably believed that the actions [he has] allegedly taken did not violate plaintiff's clearly established rights." (Second Defs.' Mem. 13.)  There is no mention of the retaliation claim against Mazzalla.

for damages against individual Defendants in their official capacity.  *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985)); *Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 436 (S.D.N.Y. 2017) (same); *Perciballi v. N.Y.*, No. 09-CV-6933, 2010 WL 3958731, at *4 (S.D.N.Y. Sept. 28, 2010) (same).  Thus, all claims filed against the remaining Defendants in their official capacity are dismissed.

### 7.  Injunctive and Declaratory Relief

Plaintiff seeks "[a] declaration that the acts and omissions described herein violated [P]laintiff's rights under the Constitution [and] laws of the United States" and a "preliminary and permanent injunction ordering Defendants . . . to stop '[a]ny [and] [all] [h]arassment, [t]ampering with [p]ersonal [and] [legal mail], [d]enial of [p]rograms, [t]heft of [p]ersonal [b]elongings, [d]enial/[d]elay of [m]edical/[m]ental [h]ealth [s]ervices, [and] ([i]ntentional [r]etaliation)."  (Am. Compl. ¶¶ 20–21.)  Plaintiff alleges that he was incarcerated at Green Haven during the events that gave rise to his Amended Complaint.  (*See generally id*.)  Plaintiff has informed this Court that he has since been transferred to a different facility and is currently located in Upstate Correctional Facility.  (*See* Letter from Plaintiff to Court (May 25, 2021) (Dkt. No. 193); Letter from Plaintiff to Court (Oct. 19, 2021)) (Dkt. No. 201); Letter from Plaintiff to Court (Dec. 9, 2021)) (Dkt. No. 223).)

Because Plaintiff is no longer incarcerated at Green Haven, his request for declaratory and injunctive relief is moot.  *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive

relief against officials of that facility."); *Hydara v. Burger*, No. 14-CV-1415, 2018 WL 1578390, at *6 (S.D.N.Y. Mar. 29, 2018) (dismissing plaintiff's claims for declaratory and injunctive relief against Defendants, who were or are employed at Orange County, as moot when plaintiff was transferred to a different correctional facility).

### 8. State Law Claims

This Court does not have subject matter jurisdiction over Plaintiff's state claims, as they are precluded from being litigated in this court by New York Correction Law § 24 ("Section 24"). Section 24 provides:

1. No civil action shall be brought in any court . . . against any officer or employee of the [Department of Corrections] . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the [Department of Corrections] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Corr. Law § 24(1) & (2). The Second Circuit has long held that Section 24 precludes a plaintiff from raising state law claims in federal court against state employees in their personal capacities for actions arising within the scope of their employment. *See, e.g., Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir. 1997) ("It is well settled that Section 24 shields employees of a state correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope of the statute."); *Baker v. Coughlin*, 77 F.3d 12, 16 (2d Cir. 1996) ("Because a New York court would have dismissed [the] claims against [the defendants] pursuant to § 24, the district court should have done so."); *accord Lyons v. Davis*, No. 17-CV-4504, 2018 WL 4759742, at *5 (S.D.N.Y. Sept. 30, 2018) ("Plaintiff's remaining state law claims are also dismissed because the Court lacks subject matter jurisdiction by virtue

of Section 24 of the New York Correction Law which designates the New York State Court of

Claims as the only venue for maintaining an action against employees of DOCS.");

*Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) ("Because such [state law] claims

would be barred in New York state courts, this Court equally lacks jurisdiction over the

claims."); *Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 138–39 (S.D.N.Y. 2002) (dismissing a

plaintiff's state-law claims because it was undisputed that all of the alleged acts or omissions of

the defendants occurred within the scope of their employment with the Department of

Corrections).[10]

### III.  Conclusion

For the foregoing reasons, Defendants' Motions are denied in part and granted in part.

First Defendants' and Matthews Motions are granted.  Second Defendants' Motion is granted for

the claims against Brogan but denied as to the claim against Mazzalla.  Because this is the first

adjudication of Plaintiff's claims on the merits, Plaintiff's claims against First Defendants,

Matthews, and Brogan are dismissed without prejudice.  If Plaintiff wishes to file a second

amended complaint alleging additional facts and otherwise addressing the deficiencies identified

above, Plaintiff must do so within 30 days of the date of this Opinion & Order.  Plaintiff is

---

[10] In 2009, the United States Supreme Court declared New York Correction Law § 24 unconstitutional to the extent it was applied to preclude plaintiffs from bringing § 1983 claims in the New York Supreme Court. *Haywood v. Drown*, 556 U.S. 729, 740 (2009).  *Haywood* "does not, however, prevent [Section 24] from stripping New York state courts of jurisdiction over a plaintiff's analogous state law claims against [Department of Corrections] officials."  *Hassell*, 96 F. Supp. 3d at 385 n.14 (emphasis omitted).  Therefore, "the Second Circuit's holding in *Baker v. Coughlin*—that federal courts cannot exercise pendent jurisdiction over state law claims that a plaintiff could not bring in state court—is unaffected by the *Haywood* decision." *Id.; May v. Donneli*, No. 06-CV-437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) ("A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.").

further advised that the second amended complaint will completely replace, not supplement, the

instant Amended Complaint.  The second amended complaint must therefore contain all of the

claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.  If Plaintiff

fails to timely file a second amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on May 9, 2023 at 2:30 PM.  The clerk of the

court is respectfully requested to terminate the pending Motions.

SO ORDERED.

Dated:   March 30, 2023
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge